STATE of Minnesota, Respondent,

v.

Elliot Kamalani DOREN, Appellant.

No. C6–02–58.

Court of Appeals of Minnesota.

Dec. 17, 2002.

---

Mike Hatch, Attorney General, and Susan Gaertner, Ramsey County Attorney, Philip C. Carruthers, Assistant Ramsey County Attorney, St. Paul, MN, for respondent.

John M. Stuart, State Public Defender, Suzanne M. Senecal–Hill, Special Assistant State Public Defender, Minneapolis, MN, for appellant.

Considered and decided by
SHUMAKER, Presiding Judge,
SCHUMACHER, Judge, and
KLAPHAKE, Judge.

## OPINION

GORDON W. SHUMAKER, Judge.

Appellant Elliot Doren contests the district court's pretrial order denying his motion to suppress evidence discovered during a traffic stop by a police officer while searching Doren, a passenger. Doren contends that the officer improperly extended the duration of the stop, had no basis for conducting two searches, and lacked a valid reason for having Doren sit in the officer's squad car during a warrants check. Because we conclude that the district court did not err in denying Doren's suppression motion, we affirm.

## FACTS

At about 1:15 in the morning of March 15, 2001, St. Paul police officer Soren Mahowald watched a car make two turns without signaling. Mahowald stopped the car, approached the driver's door, and asked the driver, Jason Olson, for his license and proof of insurance. Sitting in the front passenger seat was appellant Elliot Doren.

As Mahowald spoke with Doren, he could smell an odor of burned marijuana coming from inside the car. Mahowald also noticed that Doren's feet, arms, and hands were moving constantly, that his eyes were darting back and forth, and that he was eating a sandwich faster than Mahowald had ever seen one eaten before. The officer concluded that Doren's actions were "above and beyond the normal nervousness" he was accustomed to seeing during police stops.

When Mahowald discovered that Olson's license had been revoked, that Olson had no proof of insurance, and that the car was registered to a female whose address was in another city, Mahowald arrested Olson and placed him in the squad car. Mahowald then requested police backup.

During this time, Doren remained in the car. Mahowald went to the car and asked Doren for identification. After Doren produced identification, the officer asked him to step out of the car. As Doren stepped out of the car, the officer could tell that the burned marijuana odor was coming directly from him. Based on the odor, Doren's constant movements, and extraordinary nervousness, Mahowald concluded that Doren was under the influence of a controlled substance. When backup-officer Jeffrey Kane arrived, he also concluded that Doren was under the influence, based on Doren's "rock star behavior" and "he looked whipped out."

While Doren was standing outside the car, Mahowald asked him if he had any outstanding warrants for his arrest. Doren hesitated and then replied, "Ah, no." Then Mahowald asked him if he had any weapons, and he responded, "God, no." Mahowald asked Doren if he could pat him down for weapons and Doren consented. Mahowald frisked Doren and found nothing.

Doren's unusual behavior, the odor of burned marijuana, and his hesitation in answering the warrants question prompted Mahowald to investigate further. In Mahowald's police experience, persons who do have outstanding warrants sometimes hesitate before responding to an inquiry about warrants.

Mahowald escorted Doren to Kane's squad car and told him to sit in the back while he checked for warrants. He told Doren that if there were no warrants, Doren could leave.

As Doren began to enter the squad car, he brushed against Mahowald. The officer felt a hard, bulging object on Doren's hip. Kane also noticed the bulge. Mahowald asked Doren what the object was but Doren declined to answer. Mahowald testified that when he lifted Doren's jacket to expose the object he smelled strong odors of both burned and unburned marijuana coming from Doren. The officer saw a black pouch on Doren's hip and believed it might contain a weapon. When he opened the pouch, Mahowald found drug paraphernalia, marijuana, and a vial of a substance later determined to be methamphetamine. Mahowald arrested Doren.

After the state charged Doren with controlled substance crimes, he moved to suppress the evidence found in the pouch. The district court concluded that the police obtained evidence during a lawful protective search to ensure the officer's safety. The court denied the motion. Doren appeals.

### ISSUES

1. Did the officer impermissibly prolong a traffic stop by asking appellant, a passenger, to get out of the impounded car?

2. Was the officer entitled to ask appellant about weapons and warrants, to frisk

the him, and to ask him to sit in the squad car while he checked for warrants?

3. Did the officer improperly search appellant?

## ANALYSIS

■ Doren does not dispute the validity of the stop of the car in which he was riding as a passenger. Rather, he contends that, once the police arrested the driver, the purpose of the stop had ended and that it was improper for the officer to extend the duration of the stop by ordering Doren out of the car, asking him about weapons and warrants, searching him, and requiring him to sit in the squad car.

When reviewing pretrial orders on motions to suppress evidence, we may independently review the facts and determine, as a matter of law, whether the district court erred in suppressing—or not suppressing—the evidence.

*State v. Harris,* 590 N.W.2d 90, 98 (Minn. 1999) (citation omitted). We review the district court's findings of fact to determine whether they are clearly erroneous. *State v. George,* 557 N.W.2d 575, 578 (Minn.1997). We defer to the trier of fact on credibility assessments and reverse only if the trier has committed clear error. *See State v. Dickerson,* 481 N.W.2d 840, 843 (Minn.1992) (trial court's findings not reversed unless clearly erroneous, and great deference given to court's determinations regarding credibility of witnesses), *aff'd,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334.

### Duration of the Stop

■ "[T]he detention of [a] person stopped may not continue indefinitely but only as long as reasonably necessary to effectuate the purpose of the stop." *State v. Blacksten,* 507 N.W.2d 842, 846 (Minn. 1993) (citation omitted). Once the original suspicion that justified the stop has been dispelled, the officer may not continue to detain a person unless there exists additional reasonable suspicion. *State v. Lopez,* 631 N.W.2d 810, 813–14 (Minn.App. 2001), *review denied* (Minn. Sept. 25, 2001).

■ Doren argues that the reason for the stop was Olson's driving conduct and once the officer dealt with that matter, by ultimately arresting Olson, the purpose of the stop had been accomplished and that it was unlawful for the officer to detain Doren. Relying on *Maryland v. Wilson,* 519 U.S. 408, 411, 117 S.Ct. 882, 884–85, 137 L.Ed.2d 41 (1997), Doren argues that pending the completion of a stop, an officer cannot order a passenger out of the stopped vehicle unless there is evidence that the officer has a safety concern. Doren urges that there is no evidence that Mahowald was concerned for his safety while Doren remained in the car. Doren also cites *Wilson* for the proposition that the key analysis under the Fourth Amendment is the reasonableness of the government's invasion of a person's security.

■ Certainly, a paramount consideration under the Fourth Amendment is the reasonableness of the government's intrusion upon a person's liberty. Arguably, ordering a passenger out of a stopped motor vehicle infringes to some degree on the passenger's liberty to be left where he is. But officer safety is only one reason that will justify such an order. Another reason, the one that applies here, is that the car was going to be impounded and towed. Because the illegal driver was in custody, the car did not belong to the driver or to Doren, and there was no evidence that the owner of the car consented to Doren having possession of it, Doren had no right to remain in the impounded car. The simple act of the officer requesting Doren to step out of an impounded car

did not unreasonably extend the duration of the stop.

█ Although the original purpose of the stop had been accomplished, Mahowald acquired additional reasonable suspicion during the stop. Doren's extraordinary nervousness, the odor of burned marijuana coming from an area Doren occupied, and the appearance that Doren was under the influence of a controlled substance, provided the officer with a reasonable articulable suspicion that Doren was in possession of marijuana and allowed the officer to inquire further. *See Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (a police officer who has a reasonable suspicion that criminal activity may be taking place may perform an investigative stop of the individual who is the object of the suspicion).

Doren argues that the marijuana odor at this point was of burned marijuana and it is not illegal to smoke marijuana. But an officer reasonably might suspect that not all of the marijuana had been consumed and that some of it remained for later use.

█ The odor of burned marijuana inside a stopped motor vehicle provides probable cause for the search of the vehicle's occupants. *State v. Wicklund*, 295 Minn. 403, 405, 205 N.W.2d 509, 511 (1973). In *Wicklund*, the officer believed that one of the occupants in a car was in violation of curfew law. The officer stopped the car, and when the driver rolled down his window the officer smelled the odor of burned marijuana coming from inside the car. The supreme court held that the odor gave the officer probable cause to search the car's occupants.

Under *Terry* and *Wicklund*, we hold that Officer Mahowald had a proper and necessary reason to order Doren out of the car and to inquire further. The officer did not impermissibly extend the duration of the stop.

*The Questions, Frisk, and Warrants Check*

Doren argues that it was impermissible for Mahowald to ask him questions. Under *Terry*, the officer had a reasonable basis for "stopping" Doren, and that permitted the officer to make an investigative inquiry.

One of the questions the officer asked was whether Doren had any weapons. When Doren replied, "God, no," the officer asked if Doren minded if the officer patted him down for weapons. Doren said, "No, go ahead and check if you want to." Mahowald frisked Doren and found nothing.

█ The district court found that Doren consented to the frisk. Doren contends that he did not voluntarily agree to the pat-down but rather submitted to police authority. "[A]n officer has a right to ask to search and an individual has a right to say no." *State v. Dezso*, 512 N.W.2d 877, 880 (Minn.1994). Any consent to a search must be voluntary. *Id.* Mere acquiescence or the failure to object is not tantamount to voluntariness. *Id.* Consent may not be coerced but courts are not to infer involuntariness "simply because the circumstances of the encounter are uncomfortable for the person being questioned." *Id.* But when an encounter becomes coercive, when consent is extracted rather than received, the consent is not voluntary. *Id.* Voluntariness is a question of fact that depends on the totality of the circumstances. *Id.* The issue is whether a reasonable person in such circumstances would have felt free to decline a request to search. *Id.*

█ Doren points to circumstances that he interprets as coercive: the arrest of his driver, the flashing patrol-car lights, the presence of two officers, and the offi-

cer's order that Doren get out of the car. But in the initial encounter between Mahowald and Doren, Mahowald only asked once if Doren had any weapons and then asked once if Doren minded if the officer patted him down. There is no evidence that the officer used an intimidating tone of voice, or drew his gun, or made threats, or engaged in subterfuge to extract Doren's consent. Up until this time, the entire focus had been on Olson, and Doren was left alone in the car.

Because Doren had not driven the car, and because the officer showed no sign whatsoever that he suspected Doren of any wrongdoing or that he was about to arrest Doren, Doren reasonably could not have felt coerced into giving his consent to the frisk. The mere presence of two officers and a simple request for permission to conduct a pat-down frisk do not constitute coercion. The district court did not err in finding Doren's consent to the frisk voluntary.

But even if the district court did err in finding voluntary consent, we return to the authority in *Wicklund.* Having smelled burned marijuana in the car Doren was occupying, the officer had probable cause to search Doren.

■■■ Mahowald's other question was whether Doren had any outstanding arrest warrants. Mahowald already had a reasonable basis for suspecting that Doren was in possession of a controlled substance. As Doren admitted at the suppression hearing, he was high on drugs during the stop. The marijuana odor was traceable specifically to him. His nervousness was out of proportion to the anxiety a passenger in a stopped vehicle might be expected to show. Doren's hesitation in answering the question about warrants heightened Mahowald's suspicion. As the district court concluded, Mahowald now had two bases for reasonable suspicions.

First, that Doren was likely in possession of a controlled substance and, second, that he was a fugitive. Mahowald could lawfully continue to detain Doren while he dispelled the suspicion about the warrants. *See State v. Johnson,* 645 N.W.2d 505, 510 (Minn.App.2002).

Doren contends that the officer had no proper reason to ask him to sit in the squad car. With facts supporting the possibility that Doren was a fugitive, it was reasonable for the officer to restrict his ability to flee while the officer checked on warrants. *See State v. Bell,* 557 N.W.2d 603, 606 (Minn.App.1996) (holding that it is permissible to detain a driver stopped for speeding by putting him into the squad car while the officer checks driver and police records), *review denied* (Minn. Mar. 18, 1997).

*The Second Frisk*

■■■ Mahowald did not attempt a second frisk until Doren brushed up against him and he felt a hard object under Doren's jacket at his hip. Both Mahowald and Kane noticed a bulge at Doren's hip, and Mahowald believed it might be a weapon. However, before frisking Doren, Mahowald asked what the hard object was. When Doren refused to respond, Mahowald frisked him again and found on his hip a black pouch that contained drugs and drug paraphernalia. The second frisk was clearly justified under *Terry* as a proper protective search.

**DECISION**

The district court did not err in concluding that the police properly detained and searched appellant and in denying appellant's motion to suppress evidence found in the search.

**Affirmed.**