NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4889-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOSUE A. CARRILLO,

    Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**September 17, 2021**

**APPELLATE DIVISION**

Argued December 2, 2020 – Decided September 17, 2021

Before Judges Ostrer, Accurso and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-02-0316.

Cody T. Mason, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Cody T. Mason, of counsel and on the briefs).

Barbara A. Rosenkrans, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Barbara A Rosenkrans, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, P.J.A.D.

Just minutes after a police officer patted down Josue A. Carrillo during a traffic stop and found nothing, the officer patted him down again. That time, the officer detected what felt like a handgun. In the subsequent search, the officer seized a .22 revolver and a small bag of drugs. Carrillo pleaded guilty to possessing the handgun after the trial court denied his suppression motion on the papers.

The main issue in Carrillo's appeal is whether the officer violated Carrillo's rights when he patted him down a second time. We conclude an officer may conduct a second pat-down when, giving weight to the unproductive first one, the circumstances preceding the second one still give the officer reason to believe the suspect is armed and dangerous. Because there exist issues of fact material to that question, we reverse the trial court's order and remand for a testimonial hearing.

## I.

We review the parties' factual allegations as presented in their trial court briefs — they filed no affidavits or certifications — and the soundless motor vehicle recording of the traffic stop, which Carrillo submitted with his brief. Although Carrillo did not properly authenticate the recording, the court and the State accepted it as genuine.

The State alleged, without dispute, that Belleville police officers Werner and Lambrugo pulled over a Nissan with two occupants for speeding and "making excessive noise." It was a little before midnight. Carrillo was in the front passenger seat. As the officers approached the car, they observed Carrillo through the car's rear window "moving excessively." Standing by the passenger door, Lambrugo observed an open bottle of liquor at Carrillo's feet. Werner observed a "small metal pipe with burnt residue" at the driver's feet and asked the driver to alight from the car.

The parties dispute what happened next. The State alleged that both officers observed that "[d]efendant's pants were unzipped and he kept moving his hands near his pockets," at which point Lambrugo asked Carrillo to alight as well. Carrillo denied his pants were unzipped and "denie[d] ever moving his hands near his pockets at any point during this initial interaction." He noted that his raised hands were visible on the video recording. He also alleged that the video showed his zipper was up as he stepped out of the car.

The State alleged that backup officer Mailot noticed that Carrillo disobeyed commands to keep his hands on the vehicle and reached repeatedly for his waistband while an officer patted down the driver. The State also alleged (inaccurately, as we will explain) that the officers patted down Carrillo only once. According to the State:

A-4889-18

> Both the Defendant and the driver were told to keep their hands on the vehicle and a pat down search for officer safety was conducted. The driver was pat down and the officer felt nothing; however while the driver was being pat down, Officer Mailot . . . observed the Defendant several times attempt to take his hands off of the vehicle and place them near his waistband. Officer Mailot then informed the other officers of his observations. The Defendant was then pat down by Officer Werner but he kept trying to lean forward towards the car during the pat down. When the officer checked the Defendant's inner thigh he felt a hard item which felt like the handle of a firearm. The Defendant was then handcuffed and the officer retrieved a loaded six shot Rosco .22 caliber revolver from his pants.

The State added that the officer also seized suspected drugs.

In response, Carrillo alleged he obeyed the command to place his hands above the car while the officer patted down the driver. He contends the video confirms that. Police then patted him down and searched the vehicle. Only after the officers completed the vehicle search, and after the driver then removed his hands as an officer approached him, did Carrillo lower his hands as well. At that point, police searched him again. Carrillo alleged:

> Upon exiting the vehicle, both [the driver] and Mr. Carrillo were instructed to keep their hands on the vehicle while the officers conduct a search of the car. [The driver] was searched with negative results. . . . On the dash cam video, one can observe that while [the driver] is being searched, Mr. Carrillo stands with his hands out in front of him and he does not move his hand towards his pants. After [the driver] is searched, Mr. Carrillo is then pat down. Officers then search the

4

car. During the search of the vehicle, Mr. Carrillo keeps his hands on the vehicle. It isn't until after the search is concluded and one of the officers approaches [the driver], whose hands are off the vehicle at this point, that Mr. Carrillo takes his hands off of the vehicle. It is then that Officer Werner searches Mr. Carrillo again.

[(Footnote omitted).]

Carrillo does not dispute that he leaned forward during the second pat-down, Werner detected a firearm, and Werner seized it along with the bag of suspected drugs.

The video resolves some of the factual disputes but — primarily because Mailot often stepped in the camera's line of sight — does not resolve all of them. The video shows that as the officers approached the vehicle, the driver and Carrillo moved their heads. While the officers stood by the vehicle, both men raised their hands at one point. When Carrillo stepped out of the vehicle, his fly was not visibly open.

The video clearly demonstrates that police patted down Carrillo twice. It also belies the State's contention that Carrillo was moving his hands "while the driver was being pat down." However, Carrillo did take his hands off the vehicle later, after police completed the first-round pat-downs, they searched the vehicle, and the driver removed his hands as an officer engaged him in conversation.

5

The driver stood facing the car's trunk, with his hands on the vehicle. Carrillo stood at the rear passenger side, with his hands above the rear of the vehicle. Two minutes and fifteen seconds into the stop, according to the video's timer, an officer patted down the driver. That lasted seventeen seconds. Mailot and the other backup officer entered the picture two minutes and twenty-nine seconds (2:29) after the video began, according to the video's timer. Werner patted down Carrillo for thirty seconds, beginning at 2:37 on the timer. After doing so, Werner joined Lambrugo in searching the car, which lasted over three minutes more. Most of that time, Mailot stood directly in front of the patrol car, often blocking the camera's view of Carrillo and of the vehicle. Mailot appeared to be engaged in conversation with the driver and the other officers. During the car search, Carrillo was only a few feet away from Mailot; a fourth officer stood directly behind Carrillo, also a few feet away.

Werner finished searching the car and approached the driver after 6:48 elapsed on the timer. Four seconds later, the driver removed his hands from the vehicle and turned to face the officer. Although the camera's view is largely blocked, Carrillo appeared to observe the driver and then remove his hands from the vehicle as well. Moments later, Mailot pointed at defendant,

6                                                                                    A-4889-18

and Werner looked over and approached defendant, patted him down a second time, and soon thereafter placed him in handcuffs.

## II.

The trial judge denied Carrillo's motion without a testimonial hearing, finding that Carrillo had failed to "establish any dispute as to a material fact." The court held in its oral opinion that the video "tends to support more the State's version of the facts as opposed to the defendant's."

The court found that probable cause supported the initial traffic stop, because the car was speeding and "making excessive noise." The court also found defendant was "moving excessively" in his seat as the officers approached, and there was an open bottle of liquor on the passenger side floor and "a small metal pipe with burnt . . . residue on the driver side floor" — all facts that Carrillo did not dispute.

The court noted Carrillo's assertions that he did not move his hands near his pockets while still in the car, his zipper was not down, and he did not remove his hands from the vehicle while being patted down. Nonetheless, the court adopted the State's contested allegation that an officer observed that Carrillo's "pants were unzipped and he kept moving his hands near his pockets." The court also found the video "does not show the defendant's zipper was up when he exited the vehicle" (but the court did not expressly find

7

the video showed the zipper was down). The court held that Carrillo's excessive movements provided an objectively reasonable basis to order him out of the car.

Echoing the State's disputed allegation, the court also found that "while the driver was being pat down, it appears that . . . Mailot, who arrived on the scene as a backup, observed the defendant several times attempt to take his hands off of the vehicle and place them near his waistband." But the video evidently persuaded the court that police patted down Carrillo twice. The court held that Carrillo's "furtive movements and/or activity" and his "suspicious movements around his pants area," as well as the discovery of the "drug contraband" (an apparent reference to the small metal pipe with residue), justified the first pat-down for officer safety.

The court also held that the second pat-down was justified "because of the observations made by the . . . backup [o]fficer. Specifically, continued . . . furtive behavior by the defendant against the hood of the automobile indicating to the [o]fficer the defendant's perhaps hiding something in his pants or on his person."

Defendant thereafter pleaded guilty to second-degree possession of a handgun without a permit to carry, N.J.S.A. 2C:39-5(b)(1). Consistent with his plea agreement, the State moved to dismiss the count charging him with

8

third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1), and the court sentenced defendant to a seven-year term, with a Graves Act period of parole ineligibility of forty-two months, N.J.S.A. 2C:43-6(c).

Defendant now appeals, challenging his removal from the car, and both pat-downs. He presents the following points:

> POINT I
>
> SUPPRESSION IS REQUIRED BECAUSE THE STATE FAILED TO SHOW THAT THE POLICE ACTED LAWFULLY WHEN THEY REMOVED DEFENDANT FROM THE CAR, CONTINUED TO DETAIN HIM, AND TWICE FRISKED HIM.
>
> A. The State Failed to Prove that There Was a Heightened Danger to Justify Defendant's Removal from the Car.
>
> B. The State Failed to Justify Defendant's Continued Detention and the Frisk of His Person.
>
> C. The State Failed to Prove that There Was Reasonable Suspicion to Believe Defendant Was Armed and Dangerous Such that He Could Be Frisked a Second Time.
>
> D. Alternatively, the Matter Should Be Remanded for an Evidentiary Hearing Before a Different Judge.

A-4889-18

III.

A.

We begin with our standard of review.  We must uphold the trial court's findings on a suppression motion if "sufficient credible evidence in the record" supports them.  State v. Lamb, 218 N.J. 300, 313 (2014).  Although the court's "'feel' of the case" and opportunity to assess credibility of live witnesses is a powerful reason to defer to findings made after a testimonial hearing, see State v. Johnson, 42 N.J. 146, 161 (1964), we defer to the trial court even when it bases its findings solely on its review of documentary or video evidence, State v. S.S., 229 N.J. 360, 381 (2017).  We do so to for institutional reasons:  to recognize the trial court's "experience and expertise in fulfilling the role of factfinder"; to maintain trial courts' "legitimacy"; and to avoid duplicating efforts without significantly improving decisional accuracy.  Id. at 380-81.  But that does not mean we must give trial court findings "blind deference"; appellate courts play "an important role . . . in taking corrective action when factual findings are so clearly mistaken — so wide of the mark — that the interests of justice demand intervention."  Id. at 381.

But, what standard of review do we apply to trial court findings based not even on documentary evidence, but on the parties' unsupported allegations in their respective briefs?  On a defendant's motion to suppress evidence seized

in a warrantless search, the State must set forth its factual allegations in its brief. Rule 3:5-7(b) states, "If the search was made without a warrant, the State shall . . . file a brief, including a statement of the facts as it alleges them to be . . . ." And the defendant then responds in kind; the Rule states that "the movant shall file a brief and counter statement of facts." Ibid. Then, "[i]f material facts are disputed, testimony thereon shall be taken in open court." R. 3:5-7(c). To create a dispute, a defendant must do more than allege baldly that the search was unlawful. State v. Hewins, 166 N.J. Super. 210, 214-15 (Law Div. 1979), aff'd, 178 N.J. Super. 360 (App. Div. 1981).

We have held that Rule 3:5-7 carves out an exception to Rule 1:6-6, which generally requires that evidence on motions be presented by affidavit or certification. State v. Torres, 154 N.J. Super. 169, 172 (App. Div. 1977). Our holding was consistent with the Attorney General's position that neither side is required to file an affidavit; rather, "the existence of a factual dispute may be ascertained from an examination of the factual assertions contained in the briefs of the parties." Ibid.[1]

_____

[1] We acknowledge the contrary view that the Rule requires the State "to submit a brief and affidavit in support of the search," and only the defendant may avoid submitting an affidavit. Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 3:5-7 (2021) (emphasis added). However, neither party asks us to revisit the issue.

But factual allegations in a brief are still not evidence, documentary or otherwise. See State v. Culley, 250 N.J. Super. 558, 561 (App. Div. 1991) (stating that a "statement in [a] brief is not evidence"), overruled in part on other grounds by State v. Milne, 178 N.J. 486 (2004). So, when a trial court examines the parties' respective allegations and determines that no "material facts are disputed" requiring a testimonial hearing, we are not obliged to afford that determination the same deference we extend to findings based on documentary or video evidence. To see if parties dispute a fact, one need only examine side-by-side the parties' allegations. Determining thereby if facts are in dispute is a matter of law. See Higgins v. Thurber, 413 N.J. Super. 1, 6 (App. Div. 2010) (applying summary judgment standard), aff'd, 205 N.J. 227 (2011). And, determining if disputed facts are material is also a matter of law, because it involves determining the legal consequences that would flow from facts if established. See Lamb, 218 N.J. at 313 (stating that in reviewing an order on a suppression motion, "[a] trial court's interpretation of . . . the consequences that flow from established facts are not entitled to any special deference"). We also owe no deference to the trial court's interpretation of the law. Ibid.

B.

Applying that standard of review, we are constrained to find material factual disputes that the trial court did not.

To start, the court erred in finding that Carrillo's pants were unzipped and that he repeatedly reached for his pockets while seated in the car. Carrillo directly disputed those facts. Although the trial court found that the video did not clearly show Carrillo's zipper was up, the State bore the burden to establish the facts supporting a warrantless search or seizure. Lamb, 218 N.J. at 315. Carrillo did not bear the burden to disprove those facts. In any event, the court did not find that the video clearly showed Carrillo's zipper was down. Therefore, the fact remained disputed.

Carrillo also disputed the State's allegation that he "several times attempt[ed] to take his hands off of the vehicle and place them near his waistband" "while the driver was being pat down." Furthermore, the video clearly demonstrates that did not happen, at least when the State alleged it did; and the court's finding to the contrary was clearly mistaken. The video shows that while the driver was first patted down, Carrillo's hands were above the car's rear window and trunk-lid.[2]

---

[2] Police patted down the driver a second time only after they discovered the firearm in Carrillo's possession.

A-4889-18

Carrillo may well have removed his hands and reached for his waistband later — after officers completed the first pat-downs and searched the car, and after one officer engaged the driver in conversation. But that was not the State's allegation, and Carrillo was not obliged to counter allegations the State did not make. Nonetheless, Carrillo alleged that at that later stage of the incident, he merely lifted his hands off the car when the driver did so with no apparent consequences.

For the reasons that follow, we conclude that those factual disputes are material to reviewing the second pat-down that produced the weapon (and drugs) that Carrillo moved to suppress, but they are not material to deciding the lawfulness of removing Carrillo from the car. We turn next to Carrillo's removal from the vehicle.

## C.

We reject Carrillo's arguments that the police violated his rights by requiring him to step out of the car.[3] Under our State Constitution, "an officer must be able to point to specific and articulable facts that would warrant heightened caution to justify ordering the occupants to step out of a vehicle

_____

[3] Defendant does not challenge the traffic stop, which was supported by reasonable and articulable suspicion of at least one motor vehicle violation — speeding. State v. Locurto, 157 N.J. 463, 470 (1999) (stating "a police officer is justified in stopping a motor vehicle when he [or she] has an articulable and reasonable suspicion that the driver has committed a motor vehicle offense").

detained for a traffic violation." State v. Smith, 134 N.J. 599, 618 (1994). An "officer need not point to specific facts that the occupants are 'armed and dangerous,'" as the officer would under Terry v. Ohio, 392 U.S. 1, 27 (1968), to justify conducting a protective pat-down for a weapon (a standard we discuss at greater length below). See Smith, 134 N.J. at 618. Instead, the officer must identify "facts in the totality of circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car." Ibid.

In Smith, 134 N.J. at 619-20, the apparent passing of objects between the front and back seats in the early morning on a "largely deserted" highway justified "heightened caution." Similarly, in State v. Bacome, 228 N.J. 94, 107 (2017), the Court held that "furtive movements may satisfy the heightened-caution standard." In that case, an officer observed a passenger in a stopped vehicle lean forward as if to hide something under the seat. Id. at 97. The Court reasoned, "It would be impractical to require officers to determine whether the movement was to hide a weapon or a box of tissues before taking any precautionary measures." Id. at 107.

Here, there were sufficient facts, under the totality of circumstances, to create heightened caution, which justified Carrillo's removal from the vehicle.

15

Putting aside the dispute over Carrillo's hand movements and his zipper, the officers observed Carrillo and the driver "moving excessively." Indeed, the video supports that allegation. As in Smith, the hour was late. And though the stop occurred on an in-town road, storefronts were dark and the area was deserted. Furthermore, the officers found evidence of alcohol consumption and drug use. Taken together, the officers lawfully removed Carrillo from the vehicle.

D.

Carrillo also argues that police unlawfully extended the time he and the driver were detained before Werner conducted the second pat-down, which ultimately uncovered the handgun. Carrillo relies on the principle that when police officers stop a vehicle on suspicion of a motor vehicle violation, their intrusions on the occupant's privacy and liberty that are unrelated to the traffic-mission are temporally circumscribed. "[T]he Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention." Rodriguez v. United States, 575 U.S. 348, 354 (2015). "A seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." Id. at 350 (second and third alterations in original) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). "An

officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he [or she] may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 355 (citation omitted). However, a traffic stop's "tolerable duration" includes the time "to address the traffic violation that warranted the stop and attend to related safety concerns." Id. at 354 (emphasis added) (citations omitted). "[T]he government's officer safety interest stems from the mission of the stop itself." Id. at 356.

We shall not address Carrillo's temporal argument because he did not raise it to the trial court. "Parties must make known their positions at the suppression hearing so that the trial court can rule on the issues before it." State v. Witt, 223 N.J. 409, 419 (2015) (reversing an Appellate Division decision that reached a newly-minted argument that a stop was unlawful). When a defendant holds an issue for appeal, he or she deprives the State of the opportunity to marshal evidence to meet it. Ibid.

In particular, the State could have argued that its pursuit of traffic-related and safety-related inquiries or intrusions gave rise to suspicions of wrongdoing unrelated to the traffic offense. Under such circumstances, "an officer may broaden [the] inquiry and satisfy those suspicions." State v. Dickey, 152 N.J. 468, 479-80 (1998) (alteration in original) (quoting United

17

States v. Johnson, 58 F.3d 356, 357-58 (8th Cir. 1995)). The additional inquiries would be grounded not in the circumstances that justified the initial traffic stop; rather, they would be grounded in the new suspicions aroused by, or while conducting, the lawful traffic-related or safety-related inquiries. Ibid.

Had Carrillo argued before the trial court that the police unlawfully prolonged the stop before the second pat-down, the State would have had the opportunity to explain the basis for searching the vehicle, as well as conducting the initial pat-downs, and the trial court would have had the opportunity to rule. Therefore, we shall not address Carrillo's argument that the police unlawfully prolonged the stop.

E.

We focus now on the second pat-down. The trial court found the second pat-down was constitutionally permissible, stating that "continued . . . furtive behavior by the defendant against the hood of the automobile indicat[ed] to the [o]fficer the defendant[ was] perhaps hiding something in his pants or on his person." Thus, "[u]nder the totality of the circumstances . . . the [o]fficer was certainly justified in searching the defendant, which ultimately resulted in the recovery of a gun and drugs from the defendant."

In assessing the pat-down's constitutionality, the trial court misstated the standard. It is not enough for an officer to have reason to believe a suspect

18

"perhaps" is hiding "something." The "something" must be a weapon. Under Terry, 392 U.S. at 27, an officer must have "reason to believe that he [or she] is dealing with an armed and dangerous individual." If so, the officer is "entitled . . . to conduct a carefully limited search of the outer clothing of such person[] in an attempt to discover weapons which might be used to assault him [or her]." Id. at 30; see also State v. Nishina, 175 N.J. 502, 514-15 (2003) (stating that "[u]nder Terry . . . an officer is permitted to pat down a citizen's outer clothing when the officer 'has reason to believe that he [or she] is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime'" (quoting Terry, 392 U.S. at 27)).

Police may not conduct a Terry pat-down "simply . . . to discover drugs or drug paraphernalia" when officers "harbor[] no . . . belief that [the person] 'was armed and dangerous.'" State v. Arthur, 149 N.J. 1, 15 (1997). "Since '[t]he sole justification of the search . . . is the protection of the police officer and others nearby . . . it must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.'" State v. Thomas, 110 N.J. 673, 683 (1988) (alterations in original) (quoting Terry, 392 U.S. at 29). "The reasonableness of the search . . . is to be measured by an objective standard." Id. at 679. In State v. Privott, 203 N.J. 16, 30-32 (2010), the Court held that

19

after a suspect walked away while placing his hands near his waistband, the officer would have been justified in patting down the outer clothing for weapons, but the circumstances did not justify lifting the defendant's shirt to visually inspect the waist area, which disclosed drugs.

Of course, if an officer has reason to believe that the "something" a suspect is hiding is a weapon — as opposed to drugs or other contraband — then a "Terry frisk" may be justified under the totality of circumstances. Id. at 30; State v. Bard, 445 N.J. Super. 145, 160-61 (App. Div. 2016) (stating a Terry frisk was justified when the defendant refused to show his hand concealed in his pocket). "However, in situations where the suspect is not thought to be involved in violent criminal conduct and the officers have no prior indication that the suspect is armed, more is required to justify a protective search." Thomas, 110 N.J. at 680.

Here, the trial court did not make the essential finding that Werner had reason to believe Carrillo concealed a weapon before conducting the second pat-down. Nor did the court weigh the fact that Werner had already conducted a Terry pat-down of Carrillo, and evidently was satisfied that he was not "armed and dangerous."

The critical question is whether Werner was justified in conducting a second pat-down. As best we can tell, our courts have not expressly

articulated a standard for a second pat-down. But, like the first, a second pat-down infringes on a person's liberty and privacy. See Smith, 134 N.J. at 619 (referring to the "often embarrassing invasion of privacy that occurs in a pat-down of a person's body"). And, just as a single search warrant does not authorize officers to conduct a second search that is not a continuation of the first, see State v. Finesmith, 406 N.J. Super. 510, 519 (App. Div. 2009), the circumstances that justified a warrantless pat-down do not necessarily justify a subsequent one.

Rather, guided by other courts and the Fourth Amendment's "touchstone of reasonableness," see State v. Handy, 206 N.J. 39, 48 (2011) (quoting United States v. Ramirez, 523 U.S. 65, 71 (1998)), we conclude that an officer, to achieve the same safety goal that motivated the first pat-down, may conduct a second one, only if the totality of circumstances then present justify it. As the Seventh Circuit has put it, "The proper inquiry [for a second frisk] is whether the frisk was reasonable on the facts known to the officer at the relevant moment." United States v. Howard, 729 F.3d 655, 662 (7th Cir. 2013). As with the first pat-down, the ultimate inquiry is whether the officer has reason to believe the suspect is armed and dangerous. An unproductive first pat-down must be given weight; but so may new facts that revive protection concerns, including the realization that the first pat-down was performed inadequately.

A-4889-18

A first pat-down, properly performed, may dispel a reason to believe a suspect is armed and dangerous, rendering a second pat-down unjustified even if the suspect acts nervously or indicates he is hiding something. The court in United States v. Gonzalez, 434 F. Supp. 3d 509, 516 (S.D. Tex. 2020), suppressed evidence obtained from a "second frisk" where the "first frisk did not reveal any weapons." Nothing after the first frisk indicated the "smash and grab[]" suspect was armed and dangerous, although the defendant was sweating profusely under questioning. Id. at 514, 516.

Likewise, in Bean v. State, 142 N.E.3d 456, 462, 465 (Ind. Ct. App.), transfer denied, 149 N.E.3d 599 (Ind. 2020), the court suppressed drugs found after a second pat-down, holding it was unjustified by safety concerns. The first pat-down yielded no weapons. Id. at 459. But after police found marijuana inside the defendant's vehicle, the defendant began shifting his weight and reaching towards his groin. Id. at 460. Police searched the defendant's shoes for narcotics, not weapons, and found nothing. Id. at 460, 462. Then, the officer conducted a second pat-down. Id. at 460. As he did so, the defendant "pinched his legs together," prompting the officer to direct the defendant to "shake out the front of his pants." Ibid. The court held the pat-down was a search for drugs, not a protective search for weapons. Id. at 462.

22

Other cases reach similar results.  See State v. Pierce, 77 P.3d 292, 295 (N.M. Ct. App. 2003) (suppressing drugs discovered during a second pat-down that was motivated by a search for drugs, rejecting the contention it was justified by an incomplete first pat-down that yielded no firearms, where officers permitted the defendant to retain a pocket knife); State v. Harris, 280 S.W.3d 832, 843, 845 (Tenn. Crim. App. 2008) (suppressing fruits of a second, "more thorough" pat-down, which followed a drug-sniffing dog's positive reaction, because the pat-down was not motivated by a safety concern); cf. State v. Flowers, 734 N.W.2d 239, 256 & n.21 (Minn. 2007) (suppressing fruits of a second vehicle search, stating that where "reasonable suspicions and fears had dissipated" after an initial protective Terry search, "officers cannot, without more, conduct another search of the suspect or the vehicle that he was driving").

But new facts may revive safety concerns and justify a second pat-down. In State v. Doren, 654 N.W.2d 137, 140 (Minn. Ct. App. 2002), police smelled marijuana while observing the defendant, a car passenger, exhibit extremely nervous behavior.  With the defendant's consent, an officer conducted a pat-down that yielded nothing.  Ibid.  The officer then directed the defendant to wait in the squad car while the officers checked for warrants.  Ibid.  As he headed for the car, the defendant brushed against the officer, who "felt a hard,

23

bulging object on [the defendant]'s hip." Ibid. That new fact, the court found, justified a second protective pat-down, particularly because the defendant refused to identify the hard object. Id. at 143.

A second pat-down may also be justified when the first pat-down was incomplete or cursory, particularly if other factors are present. In United States v. Osbourne, 326 F.3d 274, 275-76 (1st Cir. 2003), a second officer lawfully "pat-frisked" a suspect immediately after another officer performed a "quick" initial "pat-frisk." The court held that the second officer "reasonably declined to regard the [first] frisk . . . as conclusive on the question whether [the suspect] was armed and dangerous," particularly because the second officer was informed that the suspect "was 'always' armed with a semi-automatic weapon and was a member of a violent street gang." Id. at 278; see also United States v. Rasberry, 882 F.3d 241, 248-49 (1st Cir. 2018) (upholding a second pat-down where the first one was limited to the defendant's lower back and did not "dispel a reasonable suspicion" that the defendant, who had a history involving firearms, was "carrying a weapon elsewhere on his person"); United States v. Green, 946 F.3d 433, 439 (8th Cir. 2019) (sustaining a second pat-down where "the first pat[-]down was quick and cursory" and police seized a weapon from the suspect's companion); Balentine v. State, 71 S.W.3d 763, 767 n.5, 770 (Tex. Crim. App. 2002)

A-4889-18

(approving a second pat-down where the officer failed to search the suspect's groin area and his "behavior after the first search heightened . . . suspicions" he was armed and dangerous).  In short, "[a]ssuming grounds to conduct a frisk" are present, police are "[n]ot necessarily" "limited to only one frisk."  4 Wayne R. LaFave, Search & Seizure § 9.6(a) (6th ed. 2020).

Ultimately, applying Terry involves a "highly fact-intensive inquiry." State v. Alessi, 240 N.J. 501, 521 (2020).  Conceivably, other factors may justify a second pat-down after a fruitless first one.  But the court must examine the totality of circumstances present when the second pat-down is performed, including the fact that an initial pat-down uncovered no weapon, to determine if the officer still had reason to believe the suspect was then armed and dangerous.

Applying these principles, we conclude that material disputed issues of fact prevented the trial court from concluding that the second pat-down was justified.  If Carrillo repeatedly reached for his pockets while seated in the car, and if Carrillo's zipper was down, that would have contributed materially to the totality of circumstances supporting suspicion that Carrillo was hiding a weapon or contraband.  Likewise, if Carrillo repeatedly removed his hands from the vehicle and reached for his waistband, that would have weighed heavily in support of a reason to believe Carrillo may have been armed and

dangerous. Indeed, those later movements may have countered the sense of safety that Werner had achieved after the first pat-down and persuaded him that he may have missed a weapon. Notably, Carrillo was wearing what seemed like a heavy jacket that may have prevented Werner from effectively searching the outer clothing for weapons.

But, for the reasons we have explained, those facts were disputed. And the facts that were undisputed do not alone support a second pat-down, even assuming for argument's sake they supported a first. "In some cases the facts that permit the officer to order the passenger to alight, with nothing more, may justify both the order to get out of the vehicle and the pat-down." Smith, 134 N.J. at 620. But that was not the case in Smith, even though the police observed "unusual movements" involving an apparent effort to pass items from the front to the back seat; and the stop occurred in the early morning on a deserted highway. Id. at 619-20.[4] Similarly, here, undisputedly, Carrillo moved excessively (but the officers did not observe items being passed). It was also late. See State v. Valentine, 134 N.J. 536, 547 (1994) (stating "the lateness of the hour . . . justifiably elevates a police officer's reasonable belief

---

[4] The pat-down was justified by events that occurred after the defendant alighted. Smith, 134 N.J. at 620-21.

that a suspect is armed and dangerous"). And the stop occurred on a deserted in-town street.

We acknowledge there was also evidence of possible drug and alcohol consumption. Although "a possible drug transaction between two people could not by itself justify a protective search," Arthur, 149 N.J. at 14, the Court has eschewed a "hard and fast rule that suspicion of illegal drug possession never can form the basis for a protective search of a suspect," Thomas, 110 N.J. at 685. And police may reasonably fear the risk of aggressive behavior by someone who has consumed too much alcohol.

But, even if those additional facts justified the first pat-down, another key fact must be added to the totality of circumstances preceding the second pat-down: the negative finding of the first one. We are mindful that "courts should not set the test of sufficient suspicion that the individual is 'armed and presently dangerous' too high when protection of the investigating officer is at stake." Valentine, 134 N.J. at 545 (quoting United States v. Riggs, 474 F.2d 699, 705 (2d Cir. 1973)); Thomas, 110 N.J. at 685 (same). Yet, we are satisfied that the second pat-down could not withstand scrutiny without resolving the disputed facts regarding hand movements in the car, the open zipper, the repeated removal of hands from the vehicle, and the reaching for the waistband.

A-4889-18

We therefore remand the case to the trial court for a testimonial hearing. And, although we do not question the trial judge's fairness, we direct that a different judge conduct the testimonial hearing because the trial judge made credibility determinations based on competing allegations and may be perceived as committed to his initial findings of fact. See In re D.L.B., ___ N.J. Super. ___, ___ (App. Div. 2021) (slip op. at 31-32).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION